IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DEMARCUS RALLS, | ) | No. C 10-4732 CRB (PR) |
| Petitioner, | ) | ORDER DENYING |
| | ) | PETITION FOR A WRIT OF |
| vs. | ) | HABEAS CORPUS AND |
| | ) | DENYING CERTIFICATE OF |
| ANTHONY HEDGPETH, Warden, | ) | APPEALABILITY |
| Respondent. | ) | |
| | ) | |

Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254. In an order filed on February 17, 2011, the court found that his petition challenging a conviction and sentence from Alameda County Superior Court, when liberally construed, stated a cognizable claim under section 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer to the order to show cause. Petitioner did not file a traverse. Having reviewed the papers and the underlying record, the court concludes that petitioner is not entitled to habeas corpus relief.

### STATEMENT OF THE CASE

On March 22, 2006, an Alameda County Superior Court jury convicted petitioner of what the California Court of Appeal described as "25 violent offenses stemming from an Oakland crime spree." People v. Ralls, No. A115775, 2009 WL 1348208 at *1 (Cal. App. 2009). The offenses included the

first degree murder of Keith Mackey Harris on December 27, 2002, and Jerry Duckworth on December 27, 2002; and the second degree murder of Douglas Ware on December 18, 2002.  The jury found two of these murders were accompanied by personal and intentional discharge of a firearm.  The jury also convicted petitioner of a third count of murder; two counts of attempted murder; one count of kidnaping to commit  robbery on January 6, 2003; five  counts of first degree robbery on December 18, 2002, and January 4, 2003, with personal use of a firearm on all but one of them;  two counts of second degree robbery on January 4, 2003, with personal use of a firearm; and six counts of attempted second degree robbery, while armed with a firearm, on November 27, 2002, January 4, 2003, and January 6, 2003.

Petitioner was sentenced to life in prison without the possibility of parole, several other indeterminate terms, and a determinate term of more than 140 years in state prison.  He unsuccessfully appealed his conviction and sentence to the California Court of Appeal and the Supreme Court of California, which denied review of a petition raising the same claims raised here.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

### A.  The Crimes

In October 2002, Joseph Mabry was shot and killed in Oakland.  A month later, on November 27, 2002, a group of Black men robbed four Hispanic males at gunpoint on West Street.  Three of the victims were shot and injured.

On the night of December 18, 2002, three members of the Leang family were robbed at their home on 29th Street by Black men armed with handguns.  Appellant Demarcus Ralls[1] later gave a statement to Oakland police that he, his cousin Deonte Donald and

---

[1]  Ralls also went by the name of Marvin Barksdale.

2

a third man named Deshawn[2] had robbed several Asian people at a house near 29th Street.  They took games and a camcorder that Donald and Deshawn sold for cash.  During a lineup, two members of the Leang family identified Ralls as one of the robbers.

Later that night, Douglas Ware was shot on Kirkham Court near 10th Street and Mandela Parkway.  He died as a result of a gunshot to the back.  A .45-caliber shell  casing was found nearby.

Ralls later gave a statement to Oakland police, admitting that earlier in the evening, he had been riding in the front passenger seat of a car with Deshawn, Donald and another man in the back seat.  Leon Wiley—also known as Twan—was driving, looking for someone named Nard.  Wiley stopped to talk with a man at 10th Street and Mandela Parkway, asking him to tell Nard that "[t]he Nut Cases" were "looking for him." If they found Nard, Ralls believed that Nard would be killed.  The occupants of the car left,[3] returning to 10th Street later in the evening, still unable to find Nard.  Wiley suggested that they "get" some other people.  Donald and Deshawn were armed.  Ralls got out of the front passenger seat of the car to let Donald and Deshawn out of the back seat.  As Ralls expected that they would, Deshawn and then Donald began shooting at a crowd of people.  One man was hit.

On December 27, 2002, two carloads of men drove up to an occupied apartment on Campbell Street and fired into it.  Two persons inside the apartment—Keith Mackey Harris and Jerry Duckworth—died of multiple gunshot wounds.  Michael Vassar was injured by gunfire.  Nineteen bullet holes were later found in the apartment's exterior metal gate.  A wooden door behind that metal gate showed many bullet holes and fragment marks.  Twenty shell casings from a .223-caliber assault rifle were found outside the apartment.  Three spent .38-caliber bullet slugs and a bullet fragment were removed from inside the apartment.  Bullet and bullet fragments recovered from the bodies of Harris and Duckworth were consistent with a .223-caliber weapon, not a .38-caliber weapon.

Ralls later told police that Wiley called his brother Joe Ralls[4] to say that he was having a problem with his neighbors.[5]  Joe Ralls, Ralls and Donald drove to meet Wiley.  Ralls had a .38-caliber pistol; his brother was armed with an assault rifle.  Wiley pointed out the house where the neighbors were living, saying that there

---

[2] Apparently, Deshawn was never identified.

[3] At this point, the 29th Street residential robberies occurred.

[4] For convenience, this opinion refers to Demarcus Ralls as "Ralls."  To distinguish between the appellant and his brother, we refer to Joe Ralls by his full name.

[5] A woman associated with Wiley lived on the same block.

were "ten niggers in there, and they got guns."  Joe Ralls reminded Wiley that he had an assault rifle.  When he told Wiley to go back into his own house because they were "about to spank these boys," Wiley left.  The Ralls brothers approached the Campbell Street house with Donald, who knocked on the door.  When someone answered, Donald asked if "you all got problems with my brother?"  Donald stepped aside and Joe Ralls began shooting.  Ralls joined in, firing off three rounds of his own.  As Ralls later described it, they "handled business."

On January 4, 2003, two or three armed Black men attempted to rob a man on East 19th Street, completed robberies of two other men on Jordan Road, and robbed two more men in the garage of a Tulip Street house.  When neighbors tried to thwart the attempted robbery on East 19th Street, one of the men shot into their home.

Two days later on January 6, 2003, three Black people kidnapped another man at gunpoint in an attempt to rob him on East 22nd Street.  One of the kidnappers threatened to kill the victim.  That same evening, Sunny Thach was shot and killed on 6th Avenue. The killer also shot at Thach's wife, Sylvia Tang.  Later that evening, in two separate incidents—one occurring on Tremont Street near the Ashby BART station and the other on Grand Avenue—four people were robbed at gunpoint by a group of Black men.  A fifth robbery by a group of Black men was also reported to have occurred that night near Ashby BART.

*B.  Pretrial Matters*

The investigation of this crime spree led Oakland police to suspect that Ralls, among others, was involved with these offenses.  Police obtained a warrant to search a vehicle suspected of being involved in some of the robberies.  The vehicle was registered to Ralls's [sic] sister-in-law, but Ralls had been associated with it.  Among the weapons found in the trunk of this vehicle on January 10, 2003, was a loaded revolver that used .38- caliber special cartridges.  A warrant issued for Ralls's arrest.

On January 22, 2003, Ralls was arrested by Sacramento police, returned to Oakland, and interviewed by Oakland police.  After he waived his rights pursuant to <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 (<u>Miranda</u>), Ralls told police that he was part of a gang called the Nutcases.  When asked what the Nutcases do, Ralls responded "Kill people."  Ralls told police that that was all the Nutcases did—kill people.  They killed  "just to be doing stuff" even if there was no money to be found.  He admitted to the police that he was involved in the shootings of Ware, Duckworth, Harris and Vassar.  He also told them that when he needed money, he used a .38 special to rob people.

In October 2003, the grand jury returned an indictment in this matter against the Ralls brothers, Donald, Wiley and four

4

others. [6]  In all, the indictment alleged 39 counts including murder, attempted murder and robbery.  Ralls was charged with five counts of murder, two counts of attempted murder, five counts of first degree robbery, seven other robbery charges, six counts of attempted robbery, and several other offenses.  (§§ 187, subd. (a), 211, 246, 422; former §§ 209, subd. (b)(1), 245, subd. (a)(2), 664.)  Two special circumstances and numerous weapons enhancements relating to him were also alleged.  (§ 190.2, subd. (a)(3), (17)(A); former §§ 12022, subd. (a)(1), 12022.5, subd. (a)(1), 12022.53, subds. (b)-(d).)  The prosecution intended to seek the death penalty for his part in these crimes.

An amended indictment was filed later that month.  In June 2004, Ralls's motion to set aside the entire indictment was denied.  The prosecution moved to sever Ralls's trial from that of his cohorts.  Most of them had made statements implicating each other and the prosecutor sought to use those confessions as evidence at trial.  In March 2005, the motion to sever was granted.

In October 2005, another amended indictment against Ralls was filed.  This one charged him with 31 counts—five counts of murder, two counts of attempted murder, five counts of first degree robbery, seven counts of second degree robbery, six counts of attempted robbery, two counts of assault with a firearm, two counts of shooting at an inhabited dwelling and single counts of kidnapping and making criminal threats.  (§§ 187, subd. (a), 211, 246, 422; former §§ 209, subd. (b)(1), 245, subd. (a)(2), 664.)  Most of the charges included allegations that Ralls was armed with, discharged or used a weapon in the commission of the underlying offenses.  The amended indictment also alleged three great bodily injury allegations related to the Harris and Duckworth murder.  It appears that at least two of the others pled guilty to some charges early in the proceedings. 6 charges and the Vassar attempted murder charge.  (Former §§ 12022, subd. (a)(1), 12022.5, subd. (a)(1), 12022.53, subds. (b)-(d).)  It alleged three special circumstances relating to two murder charges.  (§ 190.2, subd. (a)(3), (15), (17)(A).)

Before trial, Ralls moved to sever trial of the robberies and the Mabry murder charge from trial of the other counts.  The Mabry murder charge was severed from Ralls's trial on the remaining 30 counts, but the remainder of his severance motion was denied.  Two arming enhancements related to the assault with firearm charges were stricken at Ralls's request.  His Miranda motion challenging the voluntariness of his confession as involuntary was denied.

*C. Trial*

At trial, the jury heard Ralls's tape-recorded, postarrest statement to police.  His motion for acquittal of the charge of

---

[6]  It appears that at least two of the others pled guilty to some charges early in the proceedings.

making criminal threats and one count of second degree robbery was granted.  (See § 1118.1.)  The two counts of assault with a firearm and a related count of shooting at an inhabited dwelling were dismissed on the prosecution's motion.  At the close of the prosecution's case, Ralls called no witnesses.

During deliberations, a jury question about whether Ralls's [*sic*] bullets had to have been found in the victims of the underlying crimes in order to find true three related great bodily injury allegations prompted the prosecution to move to strike these allegations.  (See former § 12022.53, subd. (d) [Stats. 2001, ch. 854, § 60].)  The trial court struck the three great bodily injury enhancement allegations related to the Harris and Duckworth murder charges and the Vassar attempted murder charge.

After nine days of deliberations, in March 2006, the jury convicted Ralls of all 25 remaining charges—three counts of first degree murder, one count of second degree murder, two counts of attempted murder, five counts of first degree robbery, six counts of second degree robbery, six counts of attempted robbery, and single counts of kidnapping and shooting at an inhabited dwelling.  (§§ 187, subd. (a), 211, 246; former §§ 209, subd. (b)(1), 664.)  The jury found true six arming allegations and 15 firearm use allegations.  (Former §§ 12022, subd. (a)(1), 12022.5, subd. (a)(1), 12022.53, subds. (b)- (d).)  Four other firearm use enhancement allegations were found to be untrue.  Two 7 special circumstances were found to be true.  (§§ 190.2, subd. (a)(3), (17)(A).)  After a separate penalty phase, in April 2006, the jury fixed the punishment for Ralls's three first degree murder convictions at life imprisonment without possibility of parole.

In July 2006, Ralls's motion for new trial challenging the sufficiency of evidence supporting his conviction for the second degree murder of Ware was denied.  The remaining Mabry murder charge was dismissed on the People's motion.  Ralls was sentenced to a determinate term of 141 years 4 months in state prison.  He was also given four indeterminate terms in prison—a term of life imprisonment without possibility of parole, a term of 25 years to life, and two terms of seven years to life.

Ralls, 2009 WL 1348208 at *1-4 (footnotes in original but renumbered).

## DISCUSSION

### A.   Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

6

1   The writ may not be granted with respect to any claim that was adjudicated

2   on the merits in state court unless the state court's adjudication of the claim: "(1)

3   resulted in a decision that was contrary to, or involved an unreasonable

4   application of, clearly established Federal law, as determined by the Supreme

5   Court of the United States; or (2) resulted in a decision that was based on an

6   unreasonable determination of the facts in light of the evidence presented in the

7   State court proceeding."  Id. § 2254(d).

8   "Under the 'contrary to' clause, a federal habeas court may grant the writ if

9   the state court arrives at a conclusion opposite to that reached by [the Supreme]

10  Court on a question of law or if the state court decides a case differently than [the

11  Supreme] Court has on a set of materially indistinguishable facts."  Williams v.

12  Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application'

13  clause, a federal habeas court may grant the writ if the state court identifies the

14  correct governing legal principle from [the Supreme] Court's decisions but

15  unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

16  "[A] federal habeas court may not issue the writ simply because that court

17  concludes in its independent judgment that the relevant state-court decision

18  applied clearly established federal law erroneously or incorrectly.  Rather, that

19  application must also be unreasonable."  Id. at 411.  "[A] federal habeas court

20  making the 'unreasonable application' inquiry should ask whether the state

21  court's application of clearly established federal law was objectively

22  unreasonable."  Id. at 409.

23  The only definitive source of clearly established federal law under 28

24  U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court

25  as of the time of the state court decision.  Id. at 412.  Circuit law may be

26  "persuasive authority" for purposes of determining whether a state court decision

27  was unreasonable, but only the Supreme Court's holdings are binding on the state

28  courts, and only those holdings need be "reasonably" applied.  Id.

**B.**     <u>Claims & Analysis</u>

Petitioner raises three claims in the petition, all involving jury instructions.

For his first claim, Petitioner contends that the trial court erred in giving jury instruction CALCRIM No. 220, which he contends "obscures the scope given to individual subjectivity in that concept [of reasonable doubt] and fails to convey the necessary impression of subjective certitude the evidence must induce in the jurors in order to satisfy the due process requirement of proof beyond a reasonable doubt."   Pet., attachment at 1.

For his second claim, Petitioner contends that the trial court erred in giving CALCRIM Nos. 400 and 401.  <u>Id.</u>  The Court of Appeal characterized this argument as being that CALCRIM Nos. 400 and 401 "fail to require that an aider and abettor's mens rea in homicide cases must be his or her own, separate from that of the direct perpetrator."  <u>Ralls</u>, 2009 WL 1348208 at *7.

For his third claim, Petitioner argues "[t]he two year consecutive sentences imposed for first-degree robbery in counts 5, 6 and 7 are unauthorized and unconstitutional, and must be reduced to 1 year and four months for each count." Pet., attachment at 1.

Petitioner phrases his claims in state law terms; to the extent they are state law claims, they cannot be the basis for federal habeas relief.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).  However, in light of petitioner's pro se status the Court liberally construes them as due process claims, as has the Attorney General.

**1.**     **Standard**

"Even if there is some 'ambiguity, inconsistency or deficiency' in [a jury] instruction, such an error does not necessarily constitute a due process violation." <u>Waddington v. Sarausad</u>, 555 U.S. 179, 190 (2009) (quoting <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004).  "Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that

the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Id. at 190-91 (quoting Estelle, 502 U.S. at 72 [internal quotation marks and citation omitted]).

The pertinent question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988).

A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred, however. See Calderon v. Coleman, 525 U.S. 141, 146 (1998). A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted)

## 2.    Claim 1:  Instruction on Reasonable Doubt

The court of appeal addressed petitioner's first claim:

> First, Ralls contends that the definition of proof beyond a
> reasonable doubt in CALCRIM No. 220 improperly departs from

the definition of that term in section 1096.  He argues that the jury
instruction obscures the scope given to individual subjectivity and
fails to convey the necessary impression of subjective certitude that
the evidence must induce in the jurors in order to satisfy the due
process requirement of proof beyond a reasonable doubt.  Ralls
argues that because this error infected the jury's evaluation of his
guilt or innocence, it warrants reversal of all of his convictions.

Ralls, 2009 WL 1348208 at *5.  That is, the essence of this claim is that

CALCRIM 220 does not make clear enough that the certainty required is a

subjective one, an individual feeling rather than an objective probability. [7]

The court provided some background:

> After Ralls filed his opening brief raising this argument, the
> identical argument was soundly rejected by the Third Appellate
> District in a case in which another defendant was represented by
> Ralls's appellate counsel.  (See People v. Zepeda (2008) 167 Cal.
> App. 4th 25, 27-32 (Zepeda).)  The Zepeda court rejected this
> challenge to CALCRIM  No. 220, publishing its decision "primarily
> to deter the defense bar from continuing to use [this] line of attack
> against CALCRIM No. 220" and instead, urged "defense counsel to
> direct their resources to arguably meritorious grounds of appeal."
> (Zepeda, supra, 167 Cal. App. 4th at p. 28.)  In his appeal, Ralls
> continues to press this claim of error in his reply brief, both because
> he finds fault with the Zepeda court's analysis and because he
> wishes to preserve the issue for further review.  Having reviewed
> the Zepeda decision, we find it to be clear and sensible.  We
> paraphrase major aspects of it, adopting its reasoning
> as our own.

> Proof beyond a reasonable doubt requires a subjective state
> of near certainty about the accused's guilt.  (Jackson v. Virginia
> (1979) 443 U.S. 307, 315; Zepeda, supra, 167 Cal. App. 4th at pp.

---

[7]    The instruction read: "The fact that a criminal charge has been filed against
the defendant is not evidence that the charge is true. You must not be biased against the
defendant just because he has been arrested, charged with a crime, brought to trial, or is
in custody. [¶] A defendant in a criminal case is presumed to be innocent. This
presumption requires that the People prove each element of a crime and special
allegation beyond a reasonable doubt. Whenever I tell you the People must prove
something, I mean they must prove it beyond a reasonable doubt .[¶] Proof beyond a
reasonable doubt is proof that leaves you with an abiding conviction that the charge is
true. The evidence need not eliminate all possible doubt[,] because everything in life is
open to some possible or imaginary doubt. [¶] In deciding whether the People have
proved their case beyond a reasonable doubt, you must impartially compare and
consider all the evidence that was received throughout the entire trial and give it the
weight you think it deserves. Unless the evidence proves the defendant guilty beyond a
reasonable doubt, he is entitled to an acquittal and you must find him not guilty."  Ralls,
2009 WL 1348208 at *5.

28-29.)  California law defines reasonable doubt, in part, as the state of the case leaving the jurors' minds in such a condition that they cannot say that they feel an abiding conviction that the charge is true.  (§ 1096; <u>Zepeda</u>, supra, 167 Cal. App. 4th at p. 29, fn. 2.)  Ralls reads the "abiding conviction" language of this statute to require a subjective element that he finds lacking in CALCRIM No. 220.  Instead, he reasons, that instruction improperly conveys the impression that the standard of proof of reasonable doubt is merely that of a very high degree of objective probability.  (<u>Zepeda</u>, supra, 167 Cal. App. 4th at p. 29.)

. . . .

On appeal, Ralls asserts that the language of CALCRIM No. 220 fails to convey to the jury that the issue involves not only an objective assessment of the evidence, but something that must also be felt in a subjective manner.  He reasons that a correct jury instruction would explain that the evidence must not only convince the jurors' minds, but also satisfy their consciences.  He argues that section 1096 requires this, but that the language of CALCRIM No. 220 does not.

Ralls also reasons that the "abiding conviction" language in CALCRIM No. 220 does not save what he views as the instruction's failure to set out the subjective element of reasonable doubt because the phrase depends on the context in which it appears for its meaning.  By omitting the reference to the minds of the jurors and how they feel, Ralls contends that CALCRIM No. 220 strips the "abiding conviction" language of its power to convey to the jurors that guilt must be felt subjectively, as well as reached objectively.  Thus, he concludes the instruction misstates the proof beyond a reasonable doubt standard in such a manner that it violates his due process rights.  (<u>See</u> <u>Zepeda</u>, supra, 167  Cal. App. 4th at p. 30.)

<u>Ralls</u>, 2009 WL 1348208 at *5-6.

In resolving this issue, the court of appeal followed the rule clearly established by both federal and state law, that "[p]roof beyond a reasonable doubt requires a subjective state of near certainty about the accused's guilt.  (<u>Jackson v. Virginia</u> (1979) 443 U.S. 307, 315; <u>Zepeda, supra,</u> 167 Cal.App.4th at pp. 28-29.)"  <u>Id.</u> at *5.  But as the Attorney General points out, "the Constitution does not require a court to define 'reasonable doubt' to a jury, nor if it does so, define it in any particular manner or language."  Resp't P. & A. at 11.

Describing Ralls' argument as "almost frivolous," the court of appeal stated:

> Although the "beyond a reasonable doubt" standard is a requirement of due process, the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so.  So long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, the Constitution does not require that any particular words be used in explaining this to the jury.  It is sufficient if, taken as a whole, the instructions correctly convey the concept of reasonable doubt to the jury.  (<u>Victor v. Nebraska</u> (1994) 511 U.S. 1, 5.)  Thus, a trial court need not instruct on reasonable doubt in a manner that defines any subjective certitude required for a guilty verdict.  (<u>Zepeda, supra,</u> 167 Cal.App.4th at p. 30.)

<u>Ralls</u>, 2009 WL 1348208 at *6.

The court of appeal also dismissed Ralls's argument as "mere semantics," because "[t]he phrase 'abiding conviction'— even without being described as being 'felt'—adequately conveys the subjective state of certitude required by the standard of proof.  The term 'abiding' informs the juror that his or her conviction of guilt must be more than a strong and convincing belief.  Use of the term 'abiding' tells the juror that his or her conviction must be of a lasting and permanent nature, and it informs the juror how strongly and deeply that conviction must be held."  <u>Id.</u>

The court explained:

> Our state Supreme Court and the Courts of Appeal in every appellate district have consistently rejected Ralls's argument relating to the "abiding conviction" language set out in the predecessor standard jury instruction, CALJIC No. 2.90. [citations omitted] Those rulings apply with equal force to the language of CALCRIM No. 220. [citations omitted]  The definition of reasonable doubt in CALCRIM No. 220 derives from CALJIC No. 2.90, which was itself taken directly from the language of section 1096.  When an instruction is given according to the terms of section 1096, no further instruction defining reasonable doubt is required. [citations omitted]
>
> The "abiding conviction" language in the reasonable doubt instruction conveys a requirement that the jury's belief in the truth of the charge must be long lasting and deeply felt. [citations omitted]  This is so whether the jury's conviction is "held," "felt," or had.  One can hardly imagine a personal abiding conviction that is not deeply felt in the sense that Ralls uses those words.  Thus, contrary to his contention, the phrase "abiding conviction" needs no additional context or description to convey the depth of personal conviction required to find guilt.  (<u>Zepeda</u>, <u>supra</u>, 167 Cal. App. 4th

1    at p. 31.)

2         Beyond this, CALCRIM instructions go one step further in
     informing jurors of the subjective nature of their convictions.
3    CALCRIM No. 220's language — "proof that leaves you with an
     abiding conviction that the charge is true" — unmistakably conveys
4    the conviction's subjective nature and the very high level of
     certainty required. In addition, CALCRIM No. 3550, also given to
5    the jury by the trial court, told the jurors that each "must decide the
     case for yourself" and that they should not change their minds "just
6    because other jurors" disagree with them. We are satisfied that the
     jury did not misunderstand these instructions in the manner that
7    Ralls suggests. (See Zepeda, supra, 167 Cal. App. 4th at p. 31.)

8    Id. at *6-7.

9         The question here is whether a definition of beyond a reasonable doubt that

10   the state courts found to be correct under California law nevertheless is

11   constitutionally unacceptable. The answer is simple: In Victor v. Nebraska, 511

12   U.S. 1 (1994), the Court specifically stated that "[a]n instruction cast in terms of

13   an abiding conviction as to guilt, without reference to moral certainty, correctly

14   states the government's burden of proof." Id. at 14–15; accord Lisenbee v. Henry,

15   166 F.3d 997, 999-1000 (9th Cir. 1999) (use of term "abiding conviction" in

16   defining reasonable doubt is constitutionally sound). Under these circumstances,

17   the trial court's giving CALCRIM 220 could not possibly so infect the entire trial

18   that the resulting conviction violated due process. See Estelle v. McGuire, 502

19   U.S. at 72 (standard).

20        Because there was no due process error in giving the instruction, the state

21   Courts' decisions could not have been contrary to, or an unreasonable application

22   of, clearly established Federal law.

23        **3.    Claim 2: Instruction on Aiding and Abetting**

24        Petitioner claims that he was erroneously convicted of murder and

25   attempted murder in counts eight, nine, ten, and eleven because the jury

26   instruction on aiding and abetting failed to make clear that only his mens rea, not

27   that of the direct perpetrator, was relevant. Pet., attachment at 1. As with the

28   previous claim, the court construes this claim as raising a due process argument.

13

### a.  Procedural Default

Petitioner did not object to the instruction on aiding and abetting.   The
Attorney General correctly points out that his failure to object to the instructions
is a bar to federal review.

The Ninth Circuit has recognized and applied the California
contemporaneous objection rule in affirming denial of a federal petition on
grounds of procedural default where counsel failed to object at trial.  Inthavong v.
Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005) (holding petitioner barred from
challenging admission of evidence for failure to object at trial); Paulino v. Castro,
371 F.3d 1083, 1092–93 (9th Cir. 2004) (holding petitioner barred from
challenging jury instruction for failure to object at trial); Vansickel v. White, 166
F.3d 953, 957–58 (9th Cir. 1999) (holding petitioner barred from challenging
denial of peremptory challenges for failure to contemporaneously object).  This
claim is procedurally defaulted, and because petitioner has not shown cause and
prejudice or a miscarriage of justice, see Coleman v. Thompson, 501 U.S. 722, 750
(1991), it is barred.

### b.  Merits

The Court of Appeal also considered the merits of petitioner's claim,
assuming arguendo that petitioner was entitled to review despite his failure to
preserve error, either because any error might have affected Ralls' substantial
rights (a California state law grounds for disregarding failure to preserve error) or
because trial counsel might have been ineffective.  Ralls, 2009 WL 1348208 at
*10.

The court of appeal set out the instructions that the trial court gave on
aiding and abetting:

> The trial court instructed the jury on aiding and abetting as
> follows: "A person may be guilty of a crime in two ways. One, he
> may have directly committed the crime. Two, he may have aided and
> abetted someone else, who committed the crime. In these
> instructions, I will call that other person the perpetrator. A person is

equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." (See CALCRIM No. 400 [Jan.2006 version].)

The court continued: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor." (See CALCRIM No. 401.)

Id. at *9.

The Court of Appeal found Ralls' challenge to CALCRIM Nos. 400 and 401 "somewhat vague," describing his argument as being that "the instructions allow a jury to impute the perpetrator's mental state to him, permitting the jury to convict him as an aider and abettor so long as it could find the perpetrator guilty of that offense." Id. at *12. Therefore, he reasons, "the challenged instructions do not require the jury to find that he personally possessed the mental states required for each of the charged crimes." Id.

In light of this argument the Court of Appeal considered what mental state was required of an aider and abettor. It held that a reasonable juror would not interpret the language of CALCRIM No. 400 as imposing the same requirements for a perpetrator and an aider and abettor, and that the "instructions properly required the jury to determine Ralls's guilt based on the combined acts of the participants and his own mens rea." Id. at *12 (emphasis in original). That is, as

with the previous claim, the court of appeal determined that the instructions as given were correct under California law, and that holding is binding on this Court. As also was the case with the previous claim, the court of appeal's determination that the instruction was correct under California law is not dispositive as to the constitutional claim, the only one at issue here.

The constitutional question is whether there is reasonable likelihood that the jury applied the instruction in such a way as to read an element out of the offense. See Estelle, 502 U.S. at 72. The court of appeals considered whether the jury was likely to have convicted upon a misunderstanding of the instructions:

> With regard to the Ware second degree murder conviction, Ralls reasons that CALCRIM No. 401 improperly allowed the jury to impute the malice aforethought of shooters Donald and Deshawn to him. Citing his minimal physical contribution to the crime, he reasons that the jurors were not asked to assess whether he acted with malice aforethought. We disagree. Other instructions given required that the jury focus on Ralls's malice aforethought before it could find him guilty of the murder of Ware. (See CALCRIM No. 520.)

> The prosecution argued that he had this mens rea. Ralls's statement to police provided strong evidence of his own mental state. Although Ralls did not shoot Ware, he knew that Donald and Deshawn were armed and were offering to do the shooting. He knew that they intended to shoot into a crowd of people before he let them out of the back seat of the car. Ralls committed this act in order that they might accomplish their goal. This evidence was sufficient to satisfy the jury that Ralls himself knew and shared Donald and Deshawn's murderous intent. (See McCoy, supra, 25 Cal.4th at p. 1118.) Although the prosecution argued that Ralls was guilty of first degree murder, the jurors appear to have taken his mens rea and his acts into account when rejecting that conclusion and convicting him of only second degree murder. We are satisfied that there is no likelihood that the jury misunderstood the aiding and abetting instructions, considered in the context of all the instructions given. (See People v. Cain, supra, 10 Cal. 4th at p. 36; People v. Ramos, supra, 163 Cal. App. 4th at p. 1088; see also Estelle v. McGuire, supra, 502 U.S. at p. 72.)

> With regard to the Harris, Duckworth and Vassar completed and attempted first degree murders, Ralls argues that CALCRIM No. 401 allowed the jury to improperly impute the mental states of premeditation and/or deliberation from his brother Joe Ralls – the shooter who actually caused these deaths and injuries – to him. He reasons that there was insufficient evidence that he was privy to his

brother's intentions and that-by drawing his gun and firing[8] at the door of the house-he did no more than to spontaneously follow his brother's lead. Thus, he argues, there is a reasonable doubt about whether he shared Joe Ralls's mental state with regard to these attempted and completed murders.

We disagree with this self-serving view of the facts adduced at trial. Ralls himself told police that he knew that his brother was armed with an assault rifle when they went to the Campbell Street house to "spank" the occupants of the house. Once Joe Ralls started shooting, Ralls himself joined in, thus "handl[ing their] business." His own words make it clear that Ralls was privy to what Joe Ralls intended before the shooting began-that he knew and shared Joe Ralls's intent to kill. (See McCoy, supra, 25 Cal. 4th at p. 1118.) Ralls aided and abetted the commission of these attempted and completed murders because he knew of Joe Ralls's unlawful purpose and because he specifically intended to aid his brother in the commission of these offenses.

CALCRIM No. 401 properly focused the jury's attention on and held Ralls accountable for his own mens rea with regard to the Campbell Street murders and attempted murder. (McCoy, supra, 25 Cal. 4th at pp. 1120, 1122.) The jury instructions given on murder and attempted murder also made it clear that Ralls could not be found guilty of these offenses without possessing his own mens rea. (CALCRIM Nos. 520, 521, 540B, 600, 601.) The prosecution argued that he had this mens rea. The jury's rejection of the prosecution's plea for a first degree murder conviction on the Ware murder charge demonstrates that the jurors did not simply rubber stamp the prosecution's case, but carefully considered and applied the instructions that they were given to the facts adduced at trial. There is no likelihood that the jury misunderstood the trial court's instructions, when considered as a whole. (See People v. Cain, supra, 10 Cal. 4th at p. 36; People v. Ramos, supra, 163 Cal. App. 4th at p. 1088; see also Estelle v. McGuire, supra, 502 U.S. at p. 72.) The trial court did not err in giving CALCRIM Nos. 400 and 401 on aiding and abetting.

Ralls, 2009 WL 1348208 at *13-14.

---

[8] The jury found that Ralls personally and intentionally discharged a firearm during the commission of these offenses. It also made similar findings related to his conviction of the separate offense of shooting at the inhabited dwelling where the injuries were sustained. (See § 246; former § 12022.53, subds. (b), (c).) Thus, it is clear that the jury found that Ralls actually fired his weapon into the house. As the McCoy court acknowledged, when multiple persons commit a crime together, it may not be completely accurate to describe one as the perpetrator and the others as aiders and abettors. When all actors shoot guns, even if only one is responsible for the fatal shot, all actors serve partly as perpetrator and partly as aider and abettor. (See McCoy, supra, 25 Cal.4th at pp. 1120, 1122.) [footnote in original but renumbered.]

Given these facts, even if the instruction was ambiguous there is no reasonable likelihood that the jury applied the instruction in a way that violated the Constitution.  See Estelle v. McGuire, 502 U.S. at 72 & n.4 (standard).  There thus was no due process violation, and the state courts' rejection of this claim could not have been contrary to, or an unreasonable application of, clearly established Supreme Court authority.

c.      **Claim Three:  Length of Determinate Sentence**

Claim three is easily addressed.  The court of appeals reversed on this point:

> Thus, we conclude that Ralls is entitled to a two-year reduction in his determinate sentence.  Accordingly, we reverse the judgment on counts 5, 6 and 7 and modify those sentences.  (See In re Jonathan T., supra, 166 Cal.App.4th at p. 484.)  We remand this matter to the trial court to issue a corrected abstract of judgment reflecting the correct statutory term of one year four months for each of these three counts.

> The sentences on counts 5, 6 and 7 are reversed and modified in accordance with this opinion.  The matter is remanded to the trial court for correction of the abstract of judgment on these counts.

Ralls, 2009 WL 1348208 at *15.  The claim presumably was included in petitioner's pro se petition because he was copying his claims from an appellate brief.  He does not contend that the modification of his sentence was not made.  This claim is without merit.

## CONCLUSION

For the reasons set out above, the petition is DENIED.

A certificate of appealability is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED: March 13, 2012                    _____
                                         CHARLES R. BREYER
                                         United States District Judge

G:\PRO-SE\CRB\HC.10\Ralls, D1.denyhc-gaw.wpd